# EXHIBIT "B"

## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. 08-_____ |
| v. | : | DATE FILED: September 11, 2008 |
| CHRISTIAN J. PENTA | : | VIOLATIONS: |
| DEBORAH K. RICE, | | 18 U.S.C. § 1341 (mail fraud – 11 counts) |
|     a/k/a "Deborah K. Hausman," | : | 18 U.S.C. § 1343 (wire fraud – 14 counts) |
| JAMES HALL, IV | | 18 U.S.C. § 1957 (money laundering - |
| PAUL NEGRONI | : | 4 counts) |
| STEPHEN PORTO | | 26 U.S.C. § 7206(1) (filing false returns – |
| | | 2 counts) |
| | : | 18 U.S.C. § 2 (aiding and abetting) |
| | | Notices of forfeiture |

---

### INDICTMENT

### COUNTS ONE THROUGH ELEVEN

THE GRAND JURY CHARGES THAT:

### BACKGROUND

At all times material to this indictment:

### The Class Action Lawsuits

1.     A "class action" is a civil lawsuit brought by one or more individuals or entities on behalf of themselves and others who are similarly situated.  Typical class actions involve thousands of individuals or entities who have comparable claims.  Class action "certification" permits all claims to be heard in a single trial.

2.     In Re: Nasdaq Market-Makers Antitrust Litigation ("Nasdaq class action") was an antitrust class action lawsuit filed in the United States District Court for the Southern District of New York.  The Nasdaq class action involved the following relevant facts:

      a.     The court certified the class action on behalf of individuals and

entities who purchased or sold specific securities ("class securities") traded on the Nasdaq Stock

Exchange ("Nasdaq") from May 1, 1989 through July 17, 1996.  With approximately 3,200

companies, Nasdaq lists more companies and has more trading volume per day than any other

stock exchange in the world.

    b.  The class action alleged that the defendant "market makers"

improperly conspired to manipulate and increase the transaction costs for purchases and sales of

class securities on Nasdaq.  The "market makers" were large brokerage houses that, by

conspiring to manipulate the transaction costs, were able to exercise control over the price that a

buyer paid for a security and the price that a seller received for a security.  According to the

lawsuit, because the "market makers" conspired to increase these transaction costs during the

period of the alleged conspiracy, Nasdaq buyers and sellers of class securities paid too much for

each transaction.

    c.  On or about November 9, 1998, the court approved a settlement of

the class action which required the class action defendants to pay a total of approximately $1

billion to the class members.  The terms of the settlement provided that each approved claimant

would receive a share of the net settlement fund based on the number of class securities that the

claimant purchased or sold during the relevant period.

    3. In Re: Cendant Corporation Litigation ("Cendant class action") was a

securities class action lawsuit filed in the United States District Court for the District of New

Jersey.  The class action involved the following relevant facts:

    a.  The court certified the class action on behalf of shareholders of

Cendant Corporation ("Cendant") and CUC International ("CUC") who purchased or otherwise

acquired their publicly traded securities from May 31, 1995 through August 28, 1998.

    b.  The class action alleged that Cendant, which was formed from a merger between CUC and HFS Incorporated, issued a series of materially false and misleading financial statements and other reports, and that these statements and reports artificially inflated the price of the publicly traded securities of CUC and Cendant. Therefore, according to the lawsuit, stockholders of CUC and Cendant lost substantial sums of money after the true financial picture of the companies was revealed and the stock price plummeted.

    c.  On or about August 14, 2000, the court approved a settlement of the class action which required the class action defendants to pay a total of approximately $3 billion to the class members. Each approved claimant was entitled to a share of the net settlement fund based on the claimant's individual losses. At the time, this was the largest securities class action settlement in United States history.

    4.  <u>In Re: BankAmerica Corporation Securities Litigation</u> ("BankAmerica class action") was a securities class action lawsuit filed in the United States District Court for the Eastern District of Missouri, Eastern Division. The class action involved the following relevant facts:

    a.  The court certified the class action on behalf of shareholders of the former NationsBank Corporation ("NationsBank") and the former BankAmerica Corporation ("BankAmerica") who owned stock from August 1998 through October 1998 and on behalf of those shareholders who purchased Bank of America stock from October 1, 1998 through October 13, 1998.

    b.  The class action arose out of the merger of NationsBank and

3

BankAmerica and the formation of the corporation now known as Bank of America.  The class action alleged that the stock value in Bank of America was substantially diminished when it was disclosed only after the merger that the new entity would suffer $372 million in losses for a bad loan deal.

        c.     On or about September 30, 2002, the court approved a settlement of the class action which required the class action defendants to pay a total of approximately $490 million to the class members.  Each approved claimant was entitled to a share of the net settlement fund based on the number of shares of Nations Bank, BankAmerica, or Bank of America stock that the claimant held or purchased during the relevant period.

        5.     Following the settlement of the Nasdaq class action, a joint venture of certified public accountants ("the Joint Venture") acted as the claims administrator.  The Joint Venture involved two accounting firms known to the grand jury and identified here as Accounting Firm #1 and Accounting Firm #2.  Following the settlement of the Cendant and BankAmerica class actions, Accounting Firm #1 acted as the claims administrator.  The offices of Accounting Firm #1 were in Philadelphia, Pennsylvania, and Mt. Laurel, New Jersey.

        6.     As the claims administrators in each of these class actions, the Joint Venture (in Nasdaq) and Accounting Firm #1 (in BankAmerica and Cendant) were responsible for distributing the settlement funds to the valid claimants upon approval by the courts.  As part of this responsibility, the claims administrator was required to determine whether and to what extent each claimant was entitled to a recovery and to distribute the settlement funds accordingly.

        7.     In order to share in the settlement fund for each of the above class actions, each class member was required to submit a signed proof of claim form with supporting

documentation to the claims administrator by a date specified by the court. In the Nasdaq class action, under certain circumstances, the class member could file claims electronically and provide supporting documentation upon request. In each of these class actions, the court granted extensions for filing late claims, and at times, required additional documentation to justify the late filing. The information in the proof of claim forms and supporting documentation that each class member was required to provide was necessary to establish the legitimacy of the claim and the share of the net settlement fund to which the class member was entitled.

### The Schemers

8.      Kevin Waltzer, charged elsewhere, organized a scheme to defraud each one of the class action settlements listed above of more than $40 million by submitting false and fraudulent claims in the class action settlements. He recruited the defendants to assist him in the scheme.

9.      Defendant CHRISTIAN J. PENTA worked as a senior accountant for Accounting Firm #1 and was assigned to participate in the administration of each of the three class action settlements. In this position, defendant PENTA was responsible for various aspects of the claims process, including reviewing claim documents to determine if a claimant was entitled to recovery and addressing any issues that arose with claimants who had submitted high value claims. Defendant PENTA's position also provided him with access to the computer system that contained the electronic records of each claim and included information about whether a claim should be paid.

10.      Defendant DEBORAH K. RICE was an attorney in Florida who purported to represent a number of the fake companies used to make fraudulent claims in the class action

5

settlements listed above.  Kevin Waltzer recruited defendant RICE because defendant

CHRISTIAN J. PENTA told him that the involvement of an attorney would create the

appearance of legitimacy for fraudulent claims and thus increase the likelihood that the claims

would be paid and that the fraud would not be discovered.  In the course of "representing" the

fake companies, defendant RICE wrote cover letters to Accounting Firm #1 with false proof of

claim forms, collected the proceeds of the scheme when the claims were paid, and then

distributed the proceeds as Kevin Waltzer directed.

11.      Defendants PAUL NEGRONI, JAMES HALL, IV, and STEPHEN

PORTO filed fraudulent claims in various names, including their own, in the class action

settlements.

**THE SCHEME**

12.      From in or about mid 2001 through in or about mid 2008, Kevin Waltzer,

charged elsewhere, and defendants

**CHRISTIAN J. PENTA,**
**DEBORAH K. RICE,**
**a/k/a "Deborah K. Hausman,"**
**JAMES HALL, IV,**
**PAUL NEGRONI, and**
**STEPHEN PORTO**

and others known and unknown to the grand jury devised and intended to devise a scheme to

(a) defraud the Joint Venture, Accounting Firm #1, and others; (b) defraud Accounting Firm #1

of the intangible right to the honest services of defendant PENTA; and (c) obtain money and

property by means of false and fraudulent pretenses, representations, and promises.

6

## MANNER AND MEANS

It was part of the scheme that:

13.     Kevin Waltzer with defendants CHRISTIAN J. PENTA, DEBORAH K.

RICE, JAMES HALL, IV, PAUL NEGRONI, and STEPHEN PORTO, submitted and caused to

be submitted to the Joint Venture and Accounting Firm #1 numerous false and fraudulent claims

in each of the three class action lawsuits identified above.  These claims were false and

fraudulent because they alleged that the claimant owned or traded in the appropriate security

during the relevant period when, in fact, the claimant did not own or trade in any such security

and was not entitled to any recovery.  Through the submission of these false claims, Waltzer and

the defendants obtained over $40 million in funds to which they were not entitled.

14.     To successfully perpetrate this scheme, Kevin Waltzer, with defendants

CHRISTIAN J. PENTA, DEBORAH K. RICE, JAMES HALL, IV, PAUL NEGRONI, and

STEPHEN PORTO, took elaborate steps to pursue these fraudulent claims and produce the

necessary records to support them.  In particular, they created fake corporations, using false

names for executive personnel, with addresses in the United States and in foreign countries.

They opened bank accounts and established virtual offices for the fake corporations in the United

States and in foreign countries, with mailing addresses and telephone numbers, and used

professional office services to retrieve the mail and take telephone messages. They then created

fake brokerage account statements and other financial documents that showed the fake

company's ownership in the securities necessary to share in the class action settlement funds.

Using these false records and documents, Waltzer and the defendants submitted fraudulent

claims in the three class action lawsuits.  Each of the defendants played varying roles in the

7

scheme.

### Christian J. Penta

15.     As a senior accountant with Accounting Firm #1, defendant CHRISTIAN

J. PENTA was required to follow the code of ethics set forth in the Accounting Firm #1

Employee Handbook.  According to the code of ethics, defendant PENTA was (1) prohibited

from accepting gifts or cash from firms that did business with Accounting Firm #1; (2)

prohibited from participating in outside activities or employment which might conflict with the

interests of Accounting Firm #1; and (3) required to promptly make full disclosure to Accounting

Firm #1 of any outside interest which might conflict with the interest of Accounting Firm #1.

According to other company rules described in the Employee Handbook, defendant PENTA also

was prohibited from disclosing confidential information to an outsider and engaging in any other

activity which could cause discredit upon Accounting Firm #1.

16.     Defendant CHRISTIAN J. PENTA engaged in this fraud scheme and

violated his duty to provide honest services to his employer by acting as a corrupt insider for

Kevin Waltzer and his co-schemers.  Defendant PENTA helped ensure that the fraudulent claims

appeared to be properly and timely submitted to Accounting Firm #1, with supporting

documentation if necessary, and approved for payment.  He acted as the "eyes and ears" inside

Accounting Firm #1 of Waltzer and his co-schemers, to make sure that the fraud scheme was

successful and that it was not uncovered by Accounting Firm #1, the Joint Venture, or law

enforcement authorities.  Specifically, for example, defendant PENTA did the following:

a.     Throughout the fraud scheme, defendant PENTA advised Waltzer

when he should submit the fraudulent claims based on factors such as court deadlines, the

8

availability of funds, and the timing of distributions. When deadlines were approaching, defendant PENTA arranged for Waltzer and his co-schemers to hand deliver to defendant PENTA, and send directly to defendant PENTA through overnight mail services, the fraudulent claims so that defendant PENTA could ensure that the claims were timely processed and approved for payment. When it was necessary, defendant PENTA had Waltzer back date late claims so that they would appear to be timely filed.

    b. Defendant PENTA advised Waltzer how to prepare the claim forms and supporting documentation so that the claims would be approved for payment. Defendant PENTA provided Waltzer with confidential company documents, including documents from other claimants, to help guide Waltzer in this process.

    c. Defendant PENTA personally reviewed the documents submitted by Waltzer and his co-schemers and advised Waltzer about any corrections that needed to be made or additional information that was required for the approval process.

    d. Defendant PENTA personally approved the fraudulent claims or took whatever steps were necessary to make sure that other employees at the accounting firms approved the claims.

    e. In an effort to conceal and disguise the fraudulent nature of his relationship with Waltzer and make it appear legitimate, defendant PENTA prepared a "consulting agreement" that he and Waltzer executed. This "consulting agreement" purportedly memorialized the terms of their business relationship and provided that defendant PENTA would receive 10 percent of the funds generated by the claims that Waltzer and his co-schemers submitted in the class actions.

f.      To further conceal and disguise the fraudulent scheme from law enforcement authorities, defendant PENTA filed false federal tax returns. For the tax years 2003 and 2004, defendant PENTA reported as legitimate income a significant portion of the proceeds he generated through this fraud scheme. He falsely stated in his tax returns that he was in the business or profession of "litigation claim research." To make the business appear legitimate and obtain additional monies through false tax deductions, defendant PENTA fabricated business expenses such as meals, telephone services, Internet services, and office services. On his 2003 and 2004 tax returns, defendant PENTA also falsely listed his spouse, an individual known to the grand jury and identified here as D.R., as a "proprietor" of this supposed business who received a substantial income from the business.

17.     In or about August 2004, defendant CHRISTIAN J. PENTA left his employment at Accounting Firm #1, but continued to participate in the fraud scheme. First, he maintained his financial interest in four additional fraudulent claims that Kevin Waltzer and his co-schemers submitted in the Cendant class action and which remained pending with Accounting Firm #1 until the fraud was discovered and Accounting Firm #1 was notified of the fraud. In addition, defendant PENTA attempted to devise ways to submit more fraudulent claims with Accounting Firm #1. Thus, in or about July 2007, when Waltzer was cooperating with the government, defendant PENTA suggested that he and Waltzer find another corrupt insider at Accounting Firm #1 who could help them pursue false claims. Defendant PENTA recommended submitting claims in the names of fake companies, as they had in the past, and using their prior claims to falsely manufacture new claims.

18.     From in or about August 2002 through in or about September 2005, for his

10

role in this scheme up to that point, Kevin Waltzer paid defendant CHRISTIAN J. PENTA

approximately ten percent of the fraud proceeds, or more than $4 million.  In or about 2004,

Waltzer also purchased for defendant PENTA and his spouse a new Cadillac Escalade.  In or

about 2005, Waltzer paid $350,000 to the Internal Revenue Service on defendant PENTA's

behalf to help cover defendant PENTA's tax liability for the fraud proceeds he received in 2004.

**Deborah K. Rice**

19.     In addition to purporting to represent the fake companies used to submit

claims in the class actions, defendant DEBORAH K. RICE collected the proceeds of the scheme

when Accounting Firm #1 paid the claims, and then distributed the proceeds as Kevin Waltzer

directed.  In collecting and distributing the fraud proceeds, defendant RICE used, in addition to

her law firm attorney trust account, her personal attorney trust account and another business

account ("21st Century and Beyond, Inc.") to help disguise and conceal the illicit activity from

her law firm partner and authorities.  Specifically, for example, defendant RICE did the

following:

a.      On or about February 6, 2004, defendant RICE submitted a cover

letter and proof of claim form to Accounting Firm #1 in the Cendant class action on behalf of her

purported client, Sydney Wealth Management, Ltd. ("Sydney"), a fake Australian corporation.  In

the letter, defendant RICE falsely stated that she had recently learned of the Cendant class action

and thereafter "immediately contacted [her] client in Australia whom [she] was fairly certain

would have a substantial claim."  She further falsely stated that she was in contact with a number

of other international clients and expected to submit additional claims.  The proof of claim form

that defendant RICE signed and submitted to Accounting Firm #1 falsely represented that Sydney

11

owned CUC or Cendant securities valued at more than $36 million during the relevant period.

     As a result of this false claim, on or about March 24, 2004, Accounting Firm #1 sent defendant RICE a check for $8,077,523.26, representing Sydney's share of the settlement proceeds. Defendant RICE then deposited the fraud proceeds in her law firm trust account from which she wired the proceeds, for the benefit of Waltzer, to bank accounts of entities that he controlled.

     b.    On or about February 20, 2004, defendant RICE submitted a letter to Accounting Firm #1 in the Cendant class action on behalf of her purported client, Shanghai Yaohua Co., Ltd. ("Shanghai"), a fake Chinese corporation. In the letter, defendant RICE falsely stated that she had been in contact with Shanghai and that the company was entitled to submit a claim in this litigation. Defendant RICE stated that she had "taken this claim verbally" because of the "time sensitivity" of the matter and that she would forward the supporting documentation later. In fact, defendant Rice never had any such contact with Shanghai. She simply followed instructions from Kevin Waltzer about what to write in this letter. Defendant RICE later submitted a proof of claim form, dated February 7, 2004 – thirteen days before the date of the letter that she had sent to Accounting Firm #1 advising it of the claim. The proof of claim form falsely stated that Shanghai owned shares of CUC or Cendant securities valued at over $28,000,000 during the relevant period.

     On or about March 24, 2004, Accounting Firm #1 sent defendant RICE a check for $5,111,947.60, representing Shanghai's share of the settlement proceeds. Defendant RICE then deposited the fraud proceeds in her law firm trust account from which she wired, for the benefit of Waltzer, a portion of the proceeds to a bank account in the name of Shanghai and a

12

portion of the proceeds to Waltzer's shell company, Galt Ventures.

    For the claims she filed on behalf of Sydney and Shanghai and the minimal work performed on those matters as described above, defendant RICE and her law firm received at least $100,000.

    c.  In the BankAmerica class action, after Waltzer and his co-schemers filed fraudulent claims on behalf of fake companies and received settlement checks, defendant RICE deposited the checks in her personal attorney trust account.  Defendant RICE did not file claims on behalf of her purported clients or participate in any other way in the claims process.  Then, rather than distribute the funds to her purported clients, she simply distributed the funds to Waltzer and his entities as he directed.

    For example, on or about July 20, 2004, defendant RICE deposited into her personal attorney trust account a settlement check for $1,904,171.64 for the fraudulent claim filed on behalf of Companhia Interamerican Group.  After depositing the check in this account, defendant RICE wired $571,251.49 to Waltzer's personal account and $1,307,920.15 to Waltzer's shell company, Galt Ventures.  Defendant RICE kept $25,000 of the fraud proceeds for herself.

    Similarly, on or about August 27, 2004, defendant RICE deposited into her personal attorney trust account several settlement checks totaling $554,276.32, for fraudulent claims that Waltzer submitted on behalf of a series of fake entities under the fake parent company, Millenium Partners, Ltd.  After depositing the checks in her account, defendant RICE wired $537,647.93 to Galt Ventures and kept $16,628 of the fraud proceeds for herself.

    d.  In the Nasdaq class action, defendant RICE also deposited

13

settlement checks in her personal attorney trust account and distributed the funds to Waltzer.  For

example, on or about July 17, 2005, defendant RICE deposited in her personal attorney trust

account a settlement check for $117,712.03 for a fraudulent claim that Waltzer submitted on

behalf of Bay Area Financial Corp.  On or about the same day, defendant RICE deposited into

her personal attorney trust account a settlement check for $122,605.37 for a claim that Waltzer

submitted on behalf of Dag Trading Corp.  Defendant RICE then wired $225,000 to Galt

Ventures and kept $15,317.40 of the fraud proceeds for herself.

       e.      In or about June and July 2007, defendant RICE agreed with

Waltzer, who was now secretly cooperating with the government, to submit additional false

claims with Accounting Firm #1 in class actions, including the BankAmerica class action.

Defendant Rice suggested to Waltzer that they submit the claims using more than one law firm

entity to help make the claims appear less suspicious.  Defendant RICE and Waltzer then agreed

to submit a fake claim in the name of M&M Equity Group, LLC, which they also referred to as

"Mickey Mouse" for the fictional nature of the claim, and that defendant RICE would backdate

the cover letter to make it appear as if the claim were timely filed back in 2004.  Thus, on or

about July 19, 2007, defendant RICE sent Waltzer a letter on the letterhead of "Deborah K.

Hausman, P.A." dated June 28, 2004, addressed to Accounting Firm #1.  The letter stated that

defendant RICE represented M&M Equity Group, LLC, and that she was filing a claim on behalf

of the company in the BankAmerica class action.

       f.      On or about August 30, 2007, after pursuing the "Mickey Mouse"

claim with Waltzer, Accounting Firm #1 requested defendant RICE to provide documents in

support of four fraudulent claims in the Cendant class action that defendant RICE had submitted

in or about 2004 and were awaiting approval for payment.  Defendant RICE had submitted these

fraudulent claims on behalf of Chachma Investment House, Lewi Finance, Ltd., Queensland

Insurance Brokers, and Wyeth Resources.  She had submitted two of the claims through her law

firm and had submitted two of the claims on her own.

In its letter of August 30, 2007, Accounting Firm #1 requested clear copies of

some claim documents that defendant RICE had already provided but were illegible, additional

supporting documents for the claims, and affidavits for each claimant validating their claims.

Thus, in or about September and October 2007, defendant RICE supplied to Accounting Firm #1

a series of entirely fraudulent documents, including affidavits that she signed, attesting to the

accuracy of the fraudulent documents that she was providing.  These fraudulent claims that

defendant RICE was pursuing had a potential value of several million dollars.

**Paul Negroni and James Hall, IV**

20.     Defendants PAUL NEGRONI and JAMES HALL, IV, working with

Kevin Waltzer, filed fraudulent claims in their own names in the Nasdaq litigation and shared the

proceeds with Waltzer and defendant CHRISTIAN J. PENTA.

21.     Specifically, on or about April 10, 2002, at the direction of  Kevin

Waltzer, defendant PAUL NEGRONI sent directly to defendant CHRISTIAN J. PENTA at

Accounting Firm #1 a fraudulent proof of claim form and supporting documents for the Nasdaq

class action. According to the claim and the supporting documents, including fake brokerage

statements provided in August 2002, defendant NEGRONI falsely represented that he had traded

more than 17 million shares of Nasdaq securities during the relevant period.  Based on this

fraudulent claim, on or about September 17, 2003, Accounting Firm #1 sent Negroni a check for

15

$449,009.23 which represented his share of the settlement fund proceeds.

22.     Similarly, on or about May 20, 2002, defendant JAMES HALL, IV, sent

directly to defendant CHRISTIAN J. PENTA at Accounting Firm #1 a fraudulent proof of claim

form and supporting documents for the Nasdaq litigation.  According to the claim form and the

supporting documents, including fake brokerage statements provided later in August 2002,

defendant HALL falsely represented that he had traded more than 19 million shares of Nasdaq

securities during the relevant period.

Based on this fraudulent claim, on or about September 17, 2003, Accounting Firm

#1 sent defendant HALL a check for $507,910.99 which represented his share of the settlement

fund proceeds.   After depositing the funds in his bank account, on or about September 29, 2003,

defendant HALL wired $100,000 to defendant PENTA.  The payment to defendant PENTA

represented his share of the proceeds for both the fraudulent claim in the name of defendant

HALL and the fraudulent claim in the name of defendant PAUL NEGRONI.

23.     With the help of defendant CHRISTIAN J. PENTA, both of the above

Nasdaq claims filed by defendants PAUL NEGRONI and JAMES HALL, IV, were filed shortly

before the expiration of the final deadline for filing late claims.  Defendant PENTA advised

Kevin Waltzer about the information that would be necessary to include in the submissions to

justify the late claims and provided him with confidential documents from Accounting Firm #1

concerning the disposition of the claims.

24.     Defendants PAUL NEGRONI and JAMES HALL, IV, worked with Kevin

Waltzer to pursue other fraudulent claims in the class actions.  For example, in the BankAmerica

class action, defendant NEGRONI helped Waltzer create a fake company, submit a fake claim,

16

and then collect and distribute the proceeds.  Specifically, Waltzer and defendant NEGRONI

submitted a fraudulent proof of claim form, backdated to February 26, 2002, in the name of the

fake Denver Corporation for which they had created a virtual office in Denver, Colorado.  On or

about July 16, 2004, based on the fraudulent claim, a settlement check for $228,795.82 was

issued to the Denver Corporation.  About two months later, on or about September 7, 2004,

defendant NEGRONI incorporated the Denver Corporation in New York, using his home address

as the company's business address.  Defendant NEGRONI listed himself as president of the fake

company.  On or about September 9, 2004, defendant NEGRONI opened a bank account for the

Denver Corporation with the Bank of New York and deposited the check for $228,795.82 into

this account.  On or about September 23, 2004, defendant NEGRONI wired $190,000 of the

fraud proceeds to Waltzer's bank account for Galt Ventures.

### Stephen Porto

26.        Defendant STEPHEN PORTO also pursued fraudulent claims with Kevin

Waltzer.  For example, defendant PORTO helped Waltzer pursue a claim in the BankAmerica

class action on behalf of a fake company called KimCorp PTE Ltd. ("KimCorp"), purportedly

located in Singapore.  In or about February 2004, defendant PORTO traveled to Singapore as the

vice president of this fake company to obtain and mail documents and other information that

would help make the fake company and its records appear legitimate.  On or about February 10,

2004, in the BankAmerica class action, Waltzer and defendant PORTO filed a fraudulent claim,

signed by defendant PORTO on behalf of KimCorp.  In this fraudulent claim, defendant PORTO

stated that KimCorp owned 1,911,500 shares of NationsBank stock during the relevant period.

26.        On or about July 16, 2004, based on the fraudulent claim submitted by

Kevin Waltzer and defendant STEPHEN PORTO, Accounting Firm #1 issued a check made

payable to "KimCorp PTE Ltd. Stephen Porto" for $940,523.02, representing KimCorp's share

of the settlement proceeds. On or about July 26, 2004, defendant PORTO opened a bank account

for KimCorp at the Bank of America in Boca Raton, FL and listed himself on bank documents as

the Director/Secretary of KimCorp. Defendant PORTO then deposited the settlement check in

the account that he had just opened. On or about August 4, 2004, defendant PORTO wired

$835,523.02 to Waltzer's bank account for Galt Ventures and kept the balance of the fraud

proceeds for himself.

      27.    In or about early 2008, defendant STEPHEN PORTO agreed with Kevin

Waltzer, who was now secretly cooperating with the government, to submit an additional

fraudulent claim on behalf of KimCorp to Accounting Firm #1 in the BankAmerica class action.

Thus, on or about February 15, 2008, defendant PORTO sent to Waltzer a fraudulent proof of

claim form stating that KimCorp owned 527,750 shares of NationsBank stock during the relevant

period and therefore was entitled to a substantial recovery. Defendant PORTO signed the claim

form, certifying that the information in the form was accurate, when in fact, the information was

entirely false.

      28.    In total, as a result of this elaborate fraud scheme, Kevin Waltzer and his

co-schemers, including defendants CHRISTIAN J. PENTA, DEBORAH K. RICE, JAMES

HALL, IV, PAUL NEGRONI, and STEPHEN PORTO, received more than $40 million in fraud

proceeds. They also attempted to generate millions of dollars in additional proceeds from

fraudulent claims that were pending with Accounting Firm #1 when the fraud was discovered in

2007 and from additional fraudulent claims that the defendants intended to submit in the class

action lawsuits.

## THE MAILINGS

29.     On or about the dates set forth below, in Philadelphia, in the Eastern

District of Pennsylvania, and elsewhere, defendants

**CHRISTIAN J. PENTA,**
**DEBORAH K. RICE,**
**a/k/a "Deborah K. Hausman,"**
**JAMES HALL, IV,**
**PAUL NEGRONI, and**
**STEPHEN PORTO,**

as identified below, for the purpose of executing the scheme described above, and attempting to

do so, and aiding and abetting its execution, knowingly caused to be delivered by mail and

commercial interstate carrier according to the directions thereon the following items as described

below:

| COUNT | DEFENDANTS | DATE | DESCRIPTION |
|---|---|---|---|
| 1 | PENTA HALL | 9/17/03 | Check number 9000003408 drawn on the Citibank account of Nasdaq Market-Makers Antitrust Litigation for $507,910.99 for claim filed on behalf of HALL in Nasdaq class action, sent from Philadelphia, PA to Odenton, MD. |
| 2 | PENTA NEGRONI | 9/17/03 | Check number 9000003409 drawn on the Citibank account of Nasdaq Market-Makers Antitrust Litigation for $449,009.23 for claim filed on behalf of NEGRONI in Nasdaq class action, sent from Philadelphia, PA to New York, NY. |
| 3 | PENTA RICE | 3/24/04 | Check number 701774 drawn on the Citibank account of Accounting Firm #1 for $5,111,947.60 for claim filed on behalf of Shanghai Yaohua Co. in Cendant class action, sent from Philadelphia, PA to Boca Raton, FL. |

19

| 4 | PENTA | 3/24/04 | Check number 701517 drawn on the Citibank account of Accounting Firm #1 for $10,554,284.85 for claim filed on behalf of Millenium Partners, Ltd. in Cendant class action sent from Philadelphia, PA to London, England. |
| 5 | PENTA RICE | 3/24/04 | Check number 701772 drawn on the Citibank account of Accounting Firm #1 for $8,077,523.26 for claim filed on behalf of Sydney Wealth Management, Ltd. in Cendant class action, sent from Philadelphia, PA to Boca Raton, FL. |
| 6 | NEGRONI | 5/31/05 | Letter sent from NEGRONI in Mount Kisco, NY to Accounting Firm #1 in Philadelphia, PA seeking additional fraud proceeds for claim filed on behalf of NEGRONI in Nasdaq class action. |
| 7 | PENTA RICE HALL | 7/18/05 | Check number 060486 drawn on the Citibank account of Nasdaq Market-Makers Antitrust Litigation for $117,712.03 for claim filed on behalf of Bay Area Financial Corp. in Nasdaq class action, sent from Philadelphia, PA to Boca Raton, FL. |
| 8 | PENTA RICE HALL | 7/18/05 | Check number 060487 drawn on the account of Nasdaq Market-Makers Antitrust Litigation for $122,605.37 for claim filed on behalf of Dag Trading Corp. in Nasdaq class action, sent from Philadelphia, PA to Boca Raton, FL. |
| 9 | RICE | 7/19/07 | Letter relating to claim on behalf of M&M Equity Group, LLC in BankAmerica class action sent from RICE in Boca Raton, FL to Waltzer in Newtown, PA. |
| 10 | RICE | 10/8/07 | Letter with affidavit and claim documents on behalf of Chachma Investment House, Ltd. in Cendant class action sent from RICE in Boca Raton, FL to Accounting Firm #1 in Philadelphia, PA. |
| 11 | PORTO | 2/15/08 | Proof of claim form in BankAmerica class action on behalf of Kimcorp PTE Ltd. sent from PORTO in Boca Raton, FL to Waltzer in Newtown, PA. |

All in violation of Title 18, United States Code, Sections 1341, 1346, 1349, and 2.

## COUNTS TWELVE THROUGH TWENTY-FIVE

**THE GRAND JURY FURTHER CHARGES THAT:**

1.     Paragraphs 1 through 28 of Counts One through Eleven are incorporated here.

2.     On or about each of the dates set forth below, in Philadelphia, in the Eastern District of Pennsylvania, and elsewhere, defendants

**CHRISTIAN J. PENTA,**
**DEBORAH K. RICE,**
**a/k/a "Deborah K. Hausman,"**
**JAMES HALL, IV,**
**PAUL NEGRONI, and**
**STEPHEN PORTO,**

as identified below, for the purpose of executing the scheme described above, and attempting to do so, and aiding and abetting its execution, caused to be transmitted by means of wire communication in interstate commerce the signals and sounds described below for each count, each transmission constituting a separate count:

| COUNT | DEFENDANTS | DATE | DESCRIPTION |
|---|---|---|---|
| 12 | PENTA HALL NEGRONI | 9/29/03 | Wire of approximately $100,000 in fraud proceeds sent from HALL's account (no. ***4281) at Chevy Chase Savings Bank in Maryland to PENTA's account (no. ***5380) at Wachovia Bank in New Jersey. |
| 13 | PENTA RICE | 2/6/04 | Letter attaching fraudulent proof of claim form on behalf of Sydney Wealth Management in Cendant class action, sent via facsimile from RICE in Boca Raton, FL to Accounting Firm #1 in Philadelphia, PA. |

21

| 14 | PORTO | 2/7/04 | Letter relating to PORTO's travels to Singapore for KimCorp., a fake corporation used in the BankAmerica class action, sent via facsimile from Waltzer in Yardley, PA to PORTO in Boca Raton, FL. |
| 15 | PENTA RICE | 2/15/04 | Letter attaching fraudulent supporting documents for claim on behalf of Sydney Wealth Management in Cendant class action, sent via facsimile from RICE in Boca Raton, FL to Accounting Firm #1 in Philadelphia, PA. |
| 16 | PENTA RICE | 2/20/04 | Fraudulent proof of claim form on behalf of Shanghai Yaohua Co., Ltd. in Cendant class action, sent via facsimile from RICE in Boca Raton, FL to Accounting Firm #1 in Philadelphia, PA. |
| 17 | RICE | 4/2/04 | Wire of approximately $5,327,965.10 of fraud proceeds sent from RICE law firm trust account (no. ***1224) at Pointe Bank in Boca Raton, FL to Waltzer's Galt Ventures account (no. ***4748) at Wachovia Bank in Newtown, PA. |
| 18 | RICE | 7/28/04 | Wire of approximately $1,307,920.15 of fraud proceeds sent from RICE law firm trust account (no. ***1224) at Pointe Bank in Boca Raton, FL to Waltzer's Galt Ventures account (no. ***0835) at Commerce Bank in Newtown, PA. |
| 19 | RICE | 7/28/04 | Wire of approximately $571,251.49 of fraud proceeds sent from RICE law firm trust account (no. ***4381) at Pointe Bank in Boca Raton, FL to Waltzer's personal account (no. ***7779) at Commerce Bank in Newtown, PA. |
| 20 | PENTA | 7/29/04 | Wire of approximately $150,000 in fraud proceeds sent from Waltzer's Galt Ventures account (no. ***0835) at Commerce Bank in Newtown, PA to PENTA's account (no. ***5046) at PNC Bank in New Jersey. |

| 21 | PORTO | 8/4/04 | Wire of approximately $835,523.02 of fraud proceeds sent from account (no. ***9799) of KimCorp (controlled by PORTO) at Bank of America in Boca Raton, FL to Waltzer's Galt Ventures account (no. ***2062) at Commerce Bank in Newtown, PA. |
| 22 | RICE | 9/8/04 | Wire of approximately $537,647.93 of fraud proceeds sent from RICE attorney trust account (no. ***4381) at Pointe Bank in Boca Raton, FL to Waltzer's Galt Ventures account (no. ***0835) at Commerce Bank in Newtown, PA. |
| 23 | NEGRONI | 9/23/04 | Wire of approximately $190,000 in fraud proceeds sent from NEGRONI's  Denver Corp. account in Bank of New York in New York, NY to Waltzer's Galt Ventures account (no. ***2062) in Commerce Bank in Newtown, PA. |
| 24 | RICE | 7/20/05 | Wire of approximately $225,000 in fraud proceeds sent from RICE attorney trust account (no. ***4381) at Mercantile Bank in Boca Raton, FL to Waltzer's Galt Ventures account (no. ***2062) at Commerce Bank in Newtown, PA. |
| 25 | RICE | 10/8/07 | Fraudulent claim documents on behalf of Wyeth Resources and Queensland Insurance Brokers in Cendant class action sent via facsimile from RICE in Boca Raton, FL to Accounting Firm #1 in Philadelphia, PA. |

All in violation of Title 18, United States Code, Sections 1343, 1346, 1349, and 2.

23

## COUNTS TWENTY-SIX AND TWENTY-SEVEN

**THE GRAND JURY FURTHER CHARGES THAT:**

      1.    Paragraphs 1 through 11 and 13 through 28 of Counts One through Eleven are incorporated here.

      2.    On or about the dates set forth below, in Philadelphia, in the Eastern District of Pennsylvania, and elsewhere, defendant

**DEBORAH K. RICE,**
**a/k/a "Deborah K. Hausman,"**

knowingly engaged in, and aided and abetted, monetary transactions affecting interstate commerce in criminally derived property of a value greater than $10,000, described more fully below, and such property was derived from a specified unlawful activity, that is mail fraud, in violation of Title 18, United States Code, Section 1341, and wire fraud, in violation of Title 18, United States Code, Section 1343.

| COUNT | DATE | DESCRIPTION |
|-------|------|-------------|
| 26 | 7/1/04 | Wire of approximately $300,000 of fraud proceeds sent from RICE attorney trust account (no. ***4381) at Pointe Bank in Boca Raton, FL to Rascals Montclair, Inc. account (no. ***4365) at JP Morgan Chase in Montclair, NJ. |
| 27 | 7/12/04 | Wire of approximately $200,000 of fraud proceeds sent from RICE attorney trust account (no. ***4381) at Pointe Bank in Boca Raton, FL to Rascals Montclair, Inc. account (no. ***4365) at JP Morgan Chase in Montclair, NJ. |

      All in violation of Title 18, United States Code, Sections 1957 and 2.

## COUNTS TWENTY-EIGHT AND TWENTY-NINE

**THE GRAND JURY FURTHER CHARGES THAT:**

        1.      Paragraphs 1 through 11 and 13 through 28 of Counts One through Eleven are incorporated here.

        2.      On or about the dates set forth below, in Philadelphia, in the Eastern District of Pennsylvania, and elsewhere, defendant

### PAUL NEGRONI

knowingly engaged in, and aided and abetted monetary transactions affecting interstate commerce in criminally derived property of a value greater than $10,000, described more fully below, and such property was derived from a specified unlawful activity, that is mail fraud, in violation of Title 18, United States Code, Section 1341, and wire fraud, in violation of Title 18, United States Code, Section 1343.

| COUNT | DATE | DESCRIPTION |
|-------|------|-------------|
| 28 | 9/23/04 | Wire of approximately $190,000 of fraud proceeds sent from Denver Corporation account (no. ***8362) at Bank of New York in New York, New York to Galt Ventures account (no. ***2062) at Commerce Bank in Newtown, PA. |
| 29 | 9/23/04 | Wire of approximately $15,300 of fraud proceeds sent from Denver Corporation account (no. ***8362) at Bank of New York in New York, New York to NEGRONI's Fiserv Securities, Inc. account (no. ***6886) at PNC Bank in Philadelphia, PA. |

        All in violation of Title 18, United States Code, Sections 1957 and 2.

25

## COUNT THIRTY

**THE GRAND JURY FURTHER CHARGES THAT:**

On or about August 12, 2004, in Philadelphia, the Eastern District of

Pennsylvania, defendant

### CHRISTIAN J. PENTA

willfully made and subscribed a United States income tax return, Form 1040, for the calendar

year 2003, which was verified by a written declaration that it was made under the penalty of

perjury and filed with the Internal Revenue Service which defendant PENTA did not believe to

be true and correct as to every material matter, in that the return (1) substantially under-reported

the adjusted gross income for defendant PENTA and his spouse by stating that it was $561,482

when it should have been approximately $1,114,744; (2) falsely included gross income of

$357,500 for the spouse of defendant PENTA for her supposed principal business or profession

of "claims litigation research"; and (3) falsely included business and other expenses for both

PENTA and his spouse totaling approximately $123,116 for their alleged principal business or

profession of "claims litigation research."  In fact, as defendant PENTA well knew, (1) the

adjusted gross income was more than what he reported in that he had received additional taxable

income from Kevin Waltzer, charged elsewhere, and entities controlled by Waltzer; (2) the

spouse of defendant PENTA did not receive any income related to "claims litigation research";

and (3) there were no business or other expenses associated with defendant PENTA's supposed

"claims litigation research."

In violation of Title 26, United States Code, Section 7206(1).

26

## COUNT THIRTY-ONE

**THE GRAND JURY FURTHER CHARGES THAT:**

On or about August 15, 2005, in Philadelphia, the Eastern District of

Pennsylvania, defendant

### CHRISTIAN J. PENTA

willfully made and subscribed a United States income tax return, Form 1040, for the calendar

year 2004, which was verified by a written declaration that it was made under the penalty of

perjury and filed with the Internal Revenue Service which defendant PENTA did not believe to

be true and correct as to every material matter, in that the return (1) substantially under-reported

the adjusted gross income for defendant PENTA and his spouse by stating that it was $2,027,415

when it should have been approximately $2,894,643; (2) falsely included gross income of

$350,000 for the spouse of defendant PENTA for her supposed principal business or profession

of "claims litigation research"; and (3) falsely included business and other expenses for both

PENTA and his spouse totaling approximately $371,488 for their alleged principal business or

profession of "claims litigation research."  In fact, as defendant PENTA well knew, (1) the

adjusted gross income was more than what he reported in that he had received additional taxable

income from Kevin Waltzer, charged elsewhere, and entities controlled by Waltzer; (2) the

spouse of defendant PENTA did not receive any income related to "claims litigation research";

and (3) there were no business or other expenses associated with defendant PENTA's supposed

"claims litigation research."

In violation of Title 26, United States Code, Section 7206(1).

27

## NOTICE OF FORFEITURE NO. 1 (mail and wire fraud)

**THE GRAND JURY FURTHER CHARGES THAT:**

1.      As a result of the violations of Title 18, United States Code, Sections

1341 and 1343 set forth in this indictment, defendant

### CHRISTIAN J. PENTA

shall forfeit to the United States of America any and all property, real or personal, that constitutes

or is derived from proceeds traceable to the commission of such offenses, including but not

limited to the following:

(a)    402 New York Road, Browns Mills, New Jersey;

(b)    6 Olive Street, Browns Mills, New Jersey;

(c)    83 Green Street, Mount Holly, New Jersey;

(d)    7 Circle Drive, Browns Mills, New Jersey;

(e)    121 Main Street, Southampton, New Jersey;

(f)    132 Caley Avenue, Mount Holly, New Jersey;

(g)    134 Caley Avenue, Mount Holly, New Jersey;

(h)    4 D Amico Court, Southampton, New Jersey;

(i)    203 Evergreen Blvd., Browns Mills, New Jersey;

(j)    45 Mount Holly Avenue, Mount Holly, New Jersey; and

(k)    13 Eisenhower Lane, Browns Mills, New

28

Jersey.

2.      If any of the property subject to forfeiture, as a result of any act or

omission of the defendant:

        (a)      cannot be located upon the exercise of due diligence;

        (b)      has been transferred or sold to, or deposited with, a third party;

        (c)      has been placed beyond the jurisdiction of the Court;

        (d)      has been substantially diminished in value; or

        (e)      has been commingled with other property which cannot be divided

             without difficulty;

it is the intent of the United States, pursuant to Title 18, United States Code, Section

981(a)(1)(c), Title 28, United States Code, Section 2461(c), incorporating Title 21, United States

Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of

the property subject to forfeiture.

All pursuant to Title 18, United States Code, Section 2461(c) and Title 18, United

States Code, Section 981(a)(1)(c).

## NOTICE OF FORFEITURE NO. 2 (mail and wire fraud)

**THE GRAND JURY FURTHER CHARGES THAT:**

      1.      As a result of the violations of Title 18, United States Code, Sections

1341 and 1343, as set forth in this indictment, defendants

**CHRISTIAN J. PENTA,**
**DEBORAH K. RICE,**
**a/k/a "Deborah K. Hausman,"**
**JAMES HALL, IV,**
**PAUL NEGRONI,**
**and**
**STEPHEN PORTO**

shall forfeit to the United States of America any and all property, real or personal, that constitutes

or is derived from proceeds traceable to the commission of such offenses, including but not

limited to approximately $40 million.

      2.      If any of the property subject to forfeiture, as a result of any act or

omission of the defendants:

        (a)      cannot be located upon the exercise of due diligence;

        (b)      has been transferred or sold to, or deposited with, a third party;

        (c)      has been placed beyond the jurisdiction of the Court;

        (d)      has been substantially diminished in value; or

        (e)      has been commingled with other property which cannot be divided

              without difficulty;

it is the intent of the United States, pursuant to Title 18, United States Code, Section

981(a)(1)(c), Title 28, United States Code, Section 2461(c), incorporating Title 21, United States

Code, Section 853(p), to seek forfeiture of any other property of the defendants up to the value of

30

the property subject to forfeiture.

All pursuant to Title 18, United States Code, Section 2461(c) and Title 18, United States Code, Section 981(a)(1)(c).

31

## NOTICE OF FORFEITURE NO. 3 (money laundering)

**THE GRAND JURY FURTHER CHARGES THAT:**

1.      As a result of the violations of Title 18, United States Code, Section

1957 set forth in this indictment, defendant

**DEBORAH K. RICE,**
**a/k/a "Deborah K. Hausman,"**

shall forfeit to the United States of America any and all property, real or personal, that constitutes

or is derived from proceeds traceable to the commission of such offenses, including but not

limited to $500,000.

2.      If any of the property subject to forfeiture, as a result of any act or

omission of the defendant:

        (a)      cannot be located upon the exercise of due diligence;

        (b)      has been transferred or sold to, or deposited with, a third party;

        (c)      has been placed beyond the jurisdiction of the Court;

        (d)      has been substantially diminished in value; or

        (e)      has been commingled with other property which cannot be divided

              without difficulty;

it is the intent of the United States, pursuant to Title 18, United States Code, Section

981(a)(1)(c), Title 28, United States Code, Section 2461(c), incorporating Title 21, United States

Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of

the property subject to forfeiture.

All pursuant to Title 18, United States Code, Section 2461(c) and Title 18, United States Code, Section 981(a)(1)(c).

## NOTICE OF FORFEITURE NO. 4 (money laundering)

**THE GRAND JURY FURTHER CHARGES THAT:**

       1.    As a result of the violations of Title 18, United States Code, Section 1957 set forth in this indictment, defendant

### PAUL NEGRONI

shall forfeit to the United States of America any and all property, real or personal, that constitutes or is derived from proceeds traceable to the commission of such offenses, including but not limited to $205,300.

       2.    If any of the property subject to forfeiture, as a result of any act or omission of the defendant:

         (a)    cannot be located upon the exercise of due diligence;

         (b)    has been transferred or sold to, or deposited with, a third party;

         (c)    has been placed beyond the jurisdiction of the Court;

         (d)    has been substantially diminished in value; or

         (e)    has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(c), Title 28, United States Code, Section 2461(c), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of

the property subject to forfeiture.

         All pursuant to Title 18, United States Code, Section 2461(c) and Title 18, United

States Code, Section 981(a)(1)(c)._____

_____

                                      **A TRUE BILL:**

_____
_____**GRAND JURY FOREPERSON**

_____
**LAURIE MAGID**
**Acting United States Attorney**

35