UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CAMICO MUTUAL INSURANCE CO.<br>1800 Gateway Drive, Suite 300<br>San Mateo, CA 94404,<br><br>   Plaintiff,<br><br>   v.<br><br>HEFFLER, RADETICH & SAITTA, L.L.P.<br>1515 Market Street<br>Suite 1700<br>Philadelphia, PA 19102,<br><br>   Defendant. | Civil Action No. 11-4753 |

**FIRST AMENDED COMPLAINT**

CAMICO Mutual Insurance Co. ("**CAMICO**"), by counsel, brings this action against Heffler, Radetich & Saitta, L.L.P. ("**HRS**").

**THE PARTIES**

1.　Plaintiff CAMICO is a company organized under the laws of State of California, wherein it has its principal place of business.

2.　Defendant HRS is an accounting firm organized under the laws of Commonwealth of Pennsylvania, wherein it has its principal place of business.

**JURISDICTION AND VENUE**

3.　This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332 because:

   a.　diversity of citizenship exists between CAMICO and HRS; and

   b.　the amount in controversy exceeds $75,000, exclusive of interest and costs.

1385908.2 04/30/2012

4.      This Amended Complaint seeks: (1) a Declaratory Judgment pursuant to Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201 for the purpose of determining questions of actual controversy between the parties regarding their rights and obligations under certain contracts of insurance; and (2) Damages in an amount equal to certain defense costs incurred by CAMICO.

5.      Venue is proper under 28 U.S.C. § 1391(a)(1) and (a)(2).

**BACKGROUND**

6.      This suit involves a dispute as to the extent of any defense and of any indemnity obligation owed by CAMICO to HRS concerning potential liability (the "**Class Action Liability**") of HRS arising from, related to, or in connection with a criminal scheme perpetrated by HRS employee Christian J. Penta ("**Penta**"), prosecuted through an action styled as *United States of America v. Christian J. Penta et al.*, Docket No. 2:08-CR-00550-TJS, United States District Court for the Eastern District of Pennsylvania (the "**Penta Criminal Action**" (docket sheet thereto attached hereto as "Exhibit A")).

7.      In 2000, an antitrust class action lawsuit filed in the United States District Court for the Southern District of New York and styled *In Re: Nasdaq Market-Makers Antitrust Litigation* (the "**Nasdaq Class Action**") settled.  In connection with that settlement, a joint venture of certified public accountants (the "**Joint Venture**") acted as the claims administrator concerning the disposition of that action's settlement proceeds.

8.      The Joint Venture comprised two accounting firms, one of which was HRS.

9. Later, two other class actions were filed and settled: *In Re: Cendant Corporation Litigation* (the "**Cendant Class Action**"), a securities class action lawsuit filed in the United States District Court for the District of New Jersey, and *In Re: BankAmerica Corporation Securities Litigation* (the "**BankAmerica Class Action**"). HRS alone acted as the claims administrator concerning those two settlements.

10. Collectively, these three Nasdaq, Cendant, and BankAmerica class action lawsuits are referred to herein as the "**Class Actions**."

11. As the claims administrators in each of the Class Actions, the Joint Venture (regarding the Nasdaq Class Action) and HRS (regarding the Cendant Class Action and the BankAmerica Class Action) were responsible for distributing the settlement funds to the valid claimants upon approval by the courts.

12. As part of that responsibility, the claims administrators were required to determine whether and to what extent each claimant was entitled to a recovery and to distribute the settlement funds accordingly.

13. At pertinent times, Christian J. Penta was employed by HRS and was assigned by HRS to participate in the administration of the settlements of the Class Actions.

14. While acting as an HRS employee, Penta was responsible for various aspects of the claims process, including reviewing claim documents to determine whether a claimant was entitled to recovery and addressing any issues that arose with claimants who had, respectively, submitted "high value" claims.

15. Penta's position provided him with access to the computer system that contained the electronic records of each claim and included information about whether a claim should be paid.

16. From in or about mid-2001 through in or about mid-2008, Penta and several other individuals devised a scheme to defraud the Class Actions' respective plaintiff class members and others so as to obtain money and property by means of false and fraudulent pretenses, representations, and promises.

17. As part of and in furtherance of this scheme, Penta and others submitted and caused to be submitted to the Joint Venture and HRS several false and fraudulent claims in each of the Class Actions.

18. These claims were false and fraudulent because they alleged that the claimant owned or traded in the subject security during the relevant period when, in fact, the claimant did not own or trade in any such security and was not entitled to any recovery.

19. Through the submission of these false claims, Penta and others obtained over $40 million in funds to which they were not entitled.

20. As part of this scheme, Penta and others (the "Conspirators") took elaborate steps to pursue these fraudulent claims and produce the necessary records to support them.

21. In particular, the Conspirators created fake corporations, using false names for executive personnel, with addresses in the United States and in foreign countries. As well, they opened bank accounts and established virtual offices for the fake corporations in the United States and in foreign countries, with mailing addresses and telephone

numbers, and used professional office services to retrieve the mail and take telephone messages. They then created fake brokerage account statements and other financial documents that showed the fake company's ownership in the securities necessary to share in the class action settlement funds.

22. Using these false records and documents, Penta and others submitted fraudulent claims in connection with the settlements of the Class Actions.

23. Penta engaged in this scheme by acting as a corrupt insider for his co-conspirators.

24. Penta helped ensure that the fraudulent claims appeared to be properly and timely submitted to HRS, with supporting documentation if necessary, and that they approved for payment.

25. He acted as the "eyes and ears" inside HRS of his co-conspirators, to make sure that the fraud scheme was successful and that it was not uncovered by HRS, the Joint Venture, or law enforcement authorities.

26. In or about August 2004, Penta left his employment at HRS but continued to participate in the fraud scheme.

27. Penta maintained his financial interest in four additional fraudulent claims that his co-conspirators submitted in the Cendant Class Action and which remained pending with HRS until the fraud was discovered and HRS was notified of the fraud.

28. From in or about August 2002 through in or about September 2005, for his role in this scheme up to that point, another co-conspirator paid Penta approximately ten percent of the fraud proceeds, or more than $4 million.

29.  As part of this scheme, Penta was directly involved with the federal criminal mail and federal wire fraud acts described below:

> 3/24/04 Check number 701517 drawn on the Citibank account of HRS for $10,554,284.85 for claim filed on behalf of Millenium Partners, Ltd. in Cendant Class Action sent from Philadelphia, PA to London, England.
>
> 3/24/04 Check number 701772 drawn on the Citibank account of HRS for $8,077,523.26 for claim filed on behalf of Sydney Wealth Management, Ltd. in Cendant Class Action, sent from Philadelphia, PA to Boca Raton, FL.
>
> 9/29/03 Wire of approximately $100,000 in fraud proceeds sent from a co-schemer's account (no. \*\*\*4281) at Chevy Chase Savings Bank in Maryland to Penta's account (no. \*\*\*5380) at Wachovia Bank in New Jersey.
>
> 7/29/04 Wire of approximately $150,000 in fraud proceeds sent from a co-schemer's account (no. \*\*\*0835) at Commerce Bank in Newtown, PA to Penta's account (no. \*\*\*5046) at PNC Bank in New Jersey.

30.  Penta was indicted for the conduct described above.  *USA v. Penta et al.* Indictment ("**Penta Indictment**," attached hereto as "Exhibit B").

31.  Penta pleaded guilty to four criminal counts described in the Penta Indictment, and those counts correspond to the federal criminal mail and federal wire fraudulent acts described in paragraph 29, *supra*.  (February 24, 2009 CHANGE OF PLEA of Christian J. Penta, attached hereto as "Exhibit C," especially *id.* at 33-41 (memorializing Penta's guilty pleas to the Indictment's Counts Four, Five, Twelve, Twenty, Thirty, and Thirty-One and the factual bases thereof).)

## PRESENTATION BY HRS OF "POTENTIAL CLAIM" NOTICE

32.  Notice concerning HRS's Class Action Liability was first reported in June 2008 to CAMICO by means of a June 13, 2008 "potential claim" letter, sent by HRS's legal counsel, referencing HRS's June 5, 2008 receipt of a federal grand jury subpoena.

That subpoena sought production by HRS of documents relating to the Class Actions. (June 13, 2008 Conrad O'Brien Gellman & Rohn, PC letter, attached hereto as "Exhibit D".)

## CAMICO'S POLICY

33. CAMICO issued a "claims-made" Accountant Professionals Liability Insurance Policy, in effect for the policy period beginning on January 23, 2008 and expiring on January 23, 2009 and numbered NJL102821-04 (the "**CAMICO Policy**" or the "**Policy**," attached hereto as "Exhibit E"), insuring Heffler, Radetich & Saitta, L.L.P.

34. The Policy covers specified claims against an insured for errors in professional services provided by the insured:

> 1. The Company will pay those sums that an *Insured* becomes legally obligated to pay as *Damages* because of a *Claim* arising out of an *Insured's* negligent act, error or omission in rendering or failing to render *Professional Services* performed after the *Retroactive Date* and before the end of the *Policy Period*, provided that:
>
>> (a) the *Claim* was first made against the Insured and reported to the Company during the same *Policy Period*; and
>>
>> (b) the *Claim* does not arise from circumstances which, prior to the effective date of the *Policy Period*, any *Insured* might reasonably expect would be the basis for a *Claim*; and
>>
>> (c) the *Claim* was not reported to any professional liability insurer, including the Company, prior to the effective date of the *Policy Period* identified in the policy's Declarations.
>
> An act, error or omission which is continuing in nature shall be deemed to have occurred only on the date on which that act, error or omission began and not on any subsequent date. *Multiple Acts, Errors or Omissions* shall be deemed to have occurred only on the date that the earliest of those acts, errors or omissions began and not on any subsequent date. A *Claim* is deemed made and reported to

the Company on the date the first of the *Multiple Acts, Errors or Omissions* forming the *Claim* is reported to the Company.

(Policy, PL-1000-A (rev. 08/05), at 1, Section I, "**INSURING AGREEMENTS**,"

subsection A, "**Coverage for *Damages* and Reporting Requirements**".)

35. The Policy defines the following words, which are italicized in that Policy:

 a. *Claim* means:

 a demand received by any *Insured* for money or services, and includes the service of suit(s), a request that an *Insured* agree to waive a legal right or sign an agreement to toll a statute of limitations, or a demand for arbitration. **A *Claim* also includes two or more *Claims* arising out of or resulting** from a single act, error or omission in rendering *Professional Services*, or **from *Multiple Acts, Errors or Omissions* in rendering *Professional Services*, whether such demands are made: (1) against one or more *Insureds*, (2) by one or more *Persons*, or (3) during one or more *Policy Periods*.** [Bold emphasis added.]

(Policy, PL-1000-A (rev. 08/05), at 5-6, Section IV, "**DEFINITIONS**.")

 b. *Damages* means:

 a monetary judgment or award, or sums paid in settlement, but does not include: (1) any fine, sanction, penalty, punitive or exemplary damages, or multiplied damages (whether doubled, trebled or otherwise); (2) reimbursement of any *Insured's* fees for *Professional Services*; or (3) *Claim Expenses*.

(*Id.*)

 c. *Multiple Acts, Errors or Omissions* means:

 all acts, errors or omissions in rendering *Professional Services* that are logically or causally connected by any common fact(s), circumstances, situation, transaction(s), event(s), advice or decision(s).

(*Id.*)

 d. *Person* means "any natural person or legal entity." (*Id.*)

 e. *Policy Period* is:

> the period of time which begins on the effective date stated on the Declarations[ as "01/23/2008"] and ends on the renewal, termination, expiration or cancellation of this policy, and specifically excludes any *Extended Reporting Coverage*.

(*Id.*)

    f.    *Professional Services* are:

> any professional services performed by an *Insured* as long as the fees or commissions, if any, or other benefits from such services inure to the benefit of the *Named Insured*[, *viz.*, "Heffler Radetich & Saitta LLP."]

(*Id.*)

    g.    The *Retroactive Date*, stated in the Declarations as 01/01/1943, is "the earliest date from which this policy provides coverage for *Professional Services*." (*Id.*)

(Policy, PL-1000-A (rev. 08/05), at 5-6, Section IV, "**DEFINITIONS**.")

36.    Owners, partners, shareholders, and employees of an insured accounting firm, as well as the firm itself, are "Insureds" under the Policy:

> Each of the following *Persons* is an *Insured,* but only while performing *Professional Services* for the benefit of the *Named Insured* … on or after the *Retroactive Date:*
>
> (a)    The *Named Insured* identified in the Declarations or in an endorsement.
> (b)    A current or former owner, partner, shareholder or employee of a *Named Insured.*
> [Etc.]

(Policy, PL-1000-A (rev. 08/05), at 3-4, Section II, "**WHO IS AN *INSURED***.")

37.    The Policy contains certain exclusions which bar coverage that might otherwise be available. Among those exclusions is the "Intentional Misconduct" exclusion, barring coverage for any claim arising out of dishonest or fraudulent conduct by the insured:

This policy does not apply to:

(a) **Intentional Misconduct**: Any *Claim* based on or arising out of a dishonest, fraudulent, malicious or criminal act, error or omission of any *Insured*. The Company will defend but not indemnify an *Insured* with respect to: (i) any *Claim* alleging an *Insured* participated in, aided or abetted in a civil conspiracy, and (ii) any *Claim* alleging an *Insured* has violated any state or federal statutes prohibiting financial elder abuse.

(Policy, PL-1000-A (rev. 08/05), at 4, Section III, "**EXCLUSIONS**," subsection a.)

38. However, the Intentional Misconduct exclusion does not apply to "innocent" Insureds:

[B.]1. If coverage for a *Claim* would be void, excluded, suspended or lost as a result of any *Insured's* acts, errors or omissions excluded from coverage by section III. EXCLUSIONS, (a) Intentional Misconduct, then this policy's coverage will continue to apply to any innocent *Insured* who did not personally commit, participate, or acquiesce or remain passive after having acquired personal knowledge of such acts, errors or omissions, provided that upon acquiring personal knowledge, the innocent *Insured* promptly gives notice to the Company in accordance with section I. INSURING AGREEMENTS, A. Coverage for *Damages* and Reporting Requirements, and section VI. POLICY CONDITIONS, A. *Insured's* Duties Upon Notice of *Claim* or *Potential Claim*.

(Policy, PL-1000-A (rev. 08/05), at 9, Section VI, "**POLICY CONDITIONS**," subsection B, "***Innocent Insured***.")

39. As used in the foregoing provisions, the Policy defines the additional therein-italicized word:

*Potential Claim* is an event or circumstances that any *Insured* might reasonably expect would be the basis of a *Claim*.

(Policy, PL-1000-A (rev. 08/05), at 5-6, Section IV, "**DEFINITIONS**.")

40. In this regard, the Insuring Agreements also state:

If an *Insured* first becomes aware of a *Potential Claim* during the *Policy Period* and provides the Company with written notice as described in section VI. POLICY CONDITIONS, A. *Insured's* Duties Upon Notice of *Claim* or *Potential Claim*, paragraph 1., then any *Claim* that may be made later against an *Insured*

arising from those acts, errors or omissions will be deemed reported to the Company on the date the Company received the written notice of the *Potential Claim*.

(Policy, PL-1000-A (rev. 08/05), at 1, Section I, "**INSURING AGREEMENTS**," subsection A, "**Coverage for *Damages* and Reporting Requirements**," sub-subsection 2.)

41.    The Policy has a general limit of liability of $10,000,000 ("Per Claim" and "Policy Aggregate") as well as an "Per Claim" deductible of $200,000. (Policy, Form PL-1001-A (SS), Items 3 and 4.)

42.    However, in connection with claims arising from, related to, or in connection with an insured's misappropriation of funds, the limit of liability under the Policy is only a total of $100,000 for both Damages and Claim Expenses:

> The maximum amount payable by the Company for *Damages* and *Claim Expenses* for each covered *Claim* is the Per *Claim* Limit of Liability stated in the Declarations, less the Per *Claim* Deductible, subject to the following sub-limits:
> …
>
> (b)    The maximum amount payable by the Company for *Damages* and *Claim Expenses* for each covered *Claim* arising from, related to or in connection with any *Insured's* misappropriation, misuse, theft or embezzlement of funds shall be $100,000 in excess of the Per *Claim* Deductible.
>
> A single Per *Claim* Limit of Liability applies to a *Claim* arising from *Multiple Acts, Errors or Omissions*, regardless of the number of claimants, lawsuits, or *Insureds* involved.

(Policy, PL-1000-A (rev. 08/05), at 2, Section I, "**INSURING AGREEMENTS**," subsection C, "**Limits of Liability, Sub-Limits and Deductibles**," section 1, "**Limit of Liability – Per *Claim* and Sub-Limits**.")

43.    The Policy also contains certain enumerated conditions, including:

[A.] As a condition precedent to coverage, an *Insured* must:

1. Promptly notify the Company or its authorized representative of any *Claim* or *Potential Claim*, and include the following information, if available:

(a) The name and address of the claimant or potential claimant, and all other involved individuals;

(b) A description of the *Professional Services* provided, or that should have been provided, and the *Damages* that may result;

(c) The *Insured's* explanation of why the *Claim* was made or why the *Potential Claim* may become a *Claim*.

(Policy, PL-1000-A (rev. 08/05), at 8, Section VI, "**POLICY CONDITIONS**," subsection A, "*Insured's* **Duties Upon Notice of** *Claim* **or** *Potential Claim*.")

**THE OETTING LITIGATION**

44. On or about February 8, 2011, a "Class Action Complaint" was filed in the United States District Court for the Eastern District of Missouri, Eastern Division, captioned as <u>David P. Oetting, individually and on behalf of all others similarly situated vs. Heffler, Radeitch & Saitta, LLP</u>, Civil Action No. 4:11-cv-00253 (the "Oetting Litigation"). A true copy of the Oetting Class Action Complaint is attached hereto as Exhibit "F." After that case was transferred to this Court, Civil Action No. 2:11-cv-04757-JD, a First Amended Complaint was filed in the Oetting Litigation. A true copy of that First Amended Complaint is attached hereto as Exhibit "G." The Oetting Litigation relates to the roles of Penta and HRS role in the BankAmerica Class Action.

45. Pursuant to a reservation of rights, CAMICO has provided to HRS a defense to the Oetting Litigation. To date, CAMICO has paid approximately $235,395 in costs and expenses relating to that defense.

46. By letter dated July 6, 2011, CAMICO advised HRS that it was reserving all rights to seek to recover from HRS all costs and expenses relating to defense of the Oetting Litigation advanced by CAMICO in excess of the Policy's $100,000 sub-limit described in paragraph 42, above. A true copy of that July 6, 2011 letter is attached hereto as Exhibit "H."

47. Since that date, CAMICO has incurred approximately $67,594 in defense costs and expenses relating to the Oetting Litigation.

**FIRST CLAIM FOR RELIEF:
REQUEST FOR DECLARATORY JUDGMENT**

48. Plaintiff CAMICO incorporates and realleges its assertions stated in Paragraphs 1 through 47, *supra*.

49. CAMICO believes and has advised HRS that, under the circumstances described above and concerning the potential liability facing HRS involving the Class Actions, CAMICO owes under the Policy only a single $100,000 sub-limit of liability, applicable both to any defense or indemnity obligation under the Policy.

50. HRS disputes CAMICO's contention that only a single $100,000 sub-limit of liability applies here.

51. In particular, HRS has made a demand upon CAMICO to indemnify it for Claim Expenses and Damages, contending that, under these circumstances, CAMICO is exposed up to at least one full "Per Claim"/"Policy Aggregate" limit of liability of $10,000,000.

52. There exists, therefore, an actual controversy of justiciable issues between CAMICO and HRS within the jurisdiction of this Court regarding the rights and

liabilities of those parties under the Policy issued by CAMICO and in connection with the Class Actions and, in particular, whether CAMICO has any coverage obligation here in excess of a single $100,000 sub-limit of liability and whether CAMICO is entitled to be reimbursed for amounts it has expended in excess of such sub-limit.

WHEREFORE, CAMICO Mutual Insurance Co. respectfully requests:

(a)  That this Court determine and declare, in light of the terms of the Policy, the rights and obligations of HRS and CAMICO concerning the Class Actions;

(b)  That this Court determine and declare that, under the Policy, CAMICO owed and owes no defense or indemnity obligation concerning the Class Actions beyond a single $100,000 sub-limit;

(c)  That this Court determine and declare that, under the Policy, CAMICO is entitled to recover from HRS all amounts incurred by CAMICO relating to defense of the Oetting Litigation after July 6, 2011;

(d)  Its costs and expenses incurred herein; and

(e)  Such other relief as this Court deems appropriate.

### SECOND CLAIM FOR RELIEF: UNJUST ENRICHMENT

53.  Plaintiff CAMICO incorporates and realleges its assertions stated in Paragraphs 1 through 52, *supra*.

54.  To date, CAMICO has incurred approximately $135,395 in excess of the applicable $100,000 sub-limit with respect to its defense of HRS in the Oetting Litigation. Of that amount, approximately $67,594 was incurred after the date that CAMICO reserved its rights to seek reimbursement from HRS of all amounts paid in excess of the sublimit.

55. The amounts that CAMICO has incurred in providing a defense to HRS in theOetting Litigation has been a benefit to HRS.

56. HRS is aware of and retained the benefits conferred on it by virtue of CAMICO's expenditures in this regard.

57. To the extent CAMICO's expenditures in this regard exceed the amount of the sub-limit described above, it would be inequitable and unjust for HRS not to reimburse CAMICO. Specifically, CAMICO is entitled to reimbursement of all amounts incurred after July 6, 2011 in relation to defense of the Oetting Litigation.

WHEREFORE, CAMICO Mutual Insurance Co. respectfully requests:

(a) A judgment in its favor requiring HRS to reimburse CAMICO for all amounts expended in defense of the Oetting Litigation after July 6, 2011 in an amount to be proven at trial, but currently estimated to be $67,594,

(b) Its costs and expenses incurred herein; and

(c) Such other relief as this Court deems appropriate.

### THIRD CLAIM FOR RELIEF:
### MONEY HAD AND RECEIVED

58. Plaintiff CAMICO incorporates and realleges its assertions stated in Paragraphs 1 through 57, *supra*.

59. With respect to all defense costs incurred by CAMICO in excess of the sub-limit after July 6, 2011, CAMICO has conferred a benefit on HRS that it would inequitable to HRS to retain. CAMICO is thus entitled to reimbursement from HRS of all amounts incurred after July 6, 2011 in relation to defense of the Oetting Litigation.

WHEREFORE, CAMICO Mutual Insurance Co. respectfully requests:

(a) A judgment in its favor requiring HRS to reimburse CAMICO for all amounts expended in defense of the Oetting Litigation after July 6, 2011 in an amount to be proven at trial, but currently estimated to be $67,594,

    (b)    Its costs and expenses incurred herein; and

    (c)    Such other relief as this Court deems appropriate.

## FOURTH CLAIM FOR RELIEF:
## RECOVERY OF OVERPAYMENT

60. Plaintiff CAMICO incorporates and realleges its assertions stated in Paragraphs 1 through 59, *supra*.

61. To date, CAMICO has incurred approximately $135,395 in excess of the applicable $100,000 sub-limit with respect to its defense of the Oetting Litigation. Of that amount, approximately $67,594 was incurred after the date that CAMICO reserved its rights to seek reimbursement from HRS of all amounts paid in excess of the sublimit.

62. CAMICO is entitled to reimbursement of all amounts incurred after July 6, 2011 in relation to defense of the Oetting Litigation.

WHEREFORE, CAMICO Mutual Insurance Co. respectfully requests:

(a)    A judgment in its favor requiring HRS to reimburse CAMICO for all amounts expended in defense of the Oetting Litigation after July 6, 2011 in an amount to be proven at trial, but currently estimated to be $67,594,

(b)    Its costs and expenses incurred herein; and

(c)    Such other relief as this Court deems appropriate.

Respectfully submitted this 30th day of April, 2012.

> */s/ Joseph C. Monahan*
> Joseph C. Monahan
> Amy L. Piccola
> SAUL EWING LLP
> Centre Square West
> 1500 Market Street, 38th Floor
> Philadelphia, PA 19102-2186
> Phone: 215.972.7826
>
> OF COUNSEL
> Thomas S. Schaufelberger
> Paul A. Fitzsimmons
> SAUL EWING LLP
> 1919 Pennsylvania Avenue, NW
> Suite 550
> Washington, DC  20006
> Telephone: 202.333.8800
>
> *Attorneys for*
> CAMICO Mutual Insurance Co.

## **CERTIFICATE OF SERVICE**

I hereby certify that the foregoing First Amended Complaint was filed electronically and that notification of this filing is to be provided to the following counsel of record by the Court's ECF filing system, as follows:

Lee M. Epstein, Esquire
FRIED & EPSTEIN LLP
325 Chestnut Street, Suite 900
Philadelphia, PA  19106
*Attorney for Defendant*
*Heffler, Radetich & Saitta, LLP*

Dated:  April 30, 2012                                   /s/ Joseph C. Monahan
                                                                      Joseph C. Monahan