IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CAMICO MUTUAL INSURANCE COMPANY,:<br>Plaintiff, | CIVIL ACTION |
| vs. | NO. 11-4753 |
| HEFFLER, RADETICH & SAITTA, LLP,<br>Defendant. | FILED<br>JUN 2 8 2013<br>MICHAEL E. KUNZ, Clerk<br>By _____ Dep. Clerk |

DuBois, J.                                                                          June 27, 2013

## **MEMORANDUM**

I.     **INTRODUCTION**

       This case arises out of a dispute over insurance coverage. Defendant Heffler, Radetich & Saitta, L.L.P. ("Heffler") administers class action settlement funds, and was insured by plaintiff CAMICO Mutual Insurance Company ("CAMICO"). One of Heffler's employees, Christian Penta, participated in a scheme to siphon several million dollars of settlement proceeds to certain confederates and subsequently pled guilty in federal court to mail fraud and wire fraud. Following the discovery of Penta's scheme, certain members of a settlement class sued Heffler for damages resulting from Penta's actions, captioned as Oetting v. Heffler.[1] CAMICO has thus far funded Heffler's defense in the Oetting action, but now seeks a declaratory judgment that it has no further obligation to Heffler.

       The parties have filed cross-motions for summary judgment. For the reasons that follow, the Court grants CAMICO's motion for summary judgment as to CAMICO's claims and Heffler's counterclaims and denies Heffler's motion for summary judgment.

---

[1] Civil Action Number 11-4757, U.S. District Court for the Eastern District of Pennsylvania.

## II. BACKGROUND

CAMICO seeks, inter alia, a declaratory judgment that it has no further duty to defend or indemnify Heffler. The parties agree that Pennsylvania law applies to this case, and the Court finds "no cause sua sponte to challenge that choice of law." See Schiavone Const. Co. v. Time, Inc., 735 F.2d 94, 96 (3d Cir. 1984); see also Allegrino v. Conway E & S, Inc., 2010 WL 4052923, at *6 n.16 (W.D. Pa. Oct. 14, 2010).

"An insurer's duty to defend is broader than its duty to indemnify . . . An insurer is obligated to defend its insured if the factual allegations of the complaint on its face encompass an injury that is actually or potentially within the scope of the policy." Am. & Foreign Ins. Co. v. Jerry's Sport Ctr., Inc., 606 Pa. 584, 609 (Pa. 2010). Because the Court determines that CAMICO has no further duty to defend, it need not separately address the duty to indemnify. See Sikirica v. Nationwide Ins. Co., 416 F.3d 214, 225 (3d Cir. 2005) (noting that "there is no duty to indemnify if there is no duty to defend.")

The Court looks to the underlying Amended Complaint in the Oetting action to determine the duty to defend. "In determining the duty to defend, the complaint claiming damages must be compared to the policy and a determination made as to whether, if the allegations are sustained, the insurer would be required to pay resulting judgment." Donegal Mut. Ins. Co. v. Baumhammers, 595 Pa. 147, 155 (Pa. 2007). Thus, "the court must focus solely on the factual averments contained in the complaint itself." Lebanon Sch. Dist. v. Netherlands Ins. Co., 2013 WL 308702, at *3 (M.D. Pa. Jan. 25, 2013).

The Amended Complaint in the underlying Oetting action alleges, in pertinent part, the following facts. In 2002, Judge Nangle of the District Court for the Eastern District of Missouri approved a $490 million settlement in a class action against BankAmerica Corporation,

regarding its merger with NationsBank. (Am. Compl. at ¶2, 16.) Heffler was appointed by that court as Claims Administrator for the settlement, and Christian Penta, a senior accountant for Heffler, was assigned to help administer the settlement. (Id. at ¶5, 18.) However, "Penta . . . defrauded three separate class actions, including [that] [a]ction, of tens of millions of dollars. The amount Heffler paid from the NationsBank Class settlement fund on the false claims submitted by Penta and his co-conspirators totaled somewhere over $5.0 million." (Id. at ¶10.)

Specifically, "[w]hen the claim deadline was approaching, Penta arranged for his co-schemers to hand deliver to Penta, and send directly to Penta through overnight mail services, fraudulent claims so that Penta could ensure that the claims were timely processed and approved for payment." (Id. at ¶53.) "Penta personally approved the fraudulent claims or took whatever steps necessary to make sure that other employees at Heffler approved the claims and did not prevent the subsequent payment of the claims." (Id. at ¶54.) On September 11, 2008, Penta, along with five others, was charged by the federal government with mail fraud and wire fraud relating to the NationsBank Class Action and other class action settlements. (Id. at ¶5.) Penta later pled guilty. (Id.) David Oetting, individually and on behalf of those similarly situated, brought suit against Heffler, seeking damages sustained as a result of Penta's crimes. Oetting claimed, *inter alia*, a breach of fiduciary duty, accountant malpractice and negligence in supervising employees.

The following facts concerning the instant litigation are not materially in dispute. CAMICO issued a "claims made" liability insurance policy to Heffler, which was in effect from January 23, 2008 until January 23, 2009. (Pl. Statement of Undisputed Material Facts, at ¶8; Resp. to Pl. Statement, at ¶1.) CAMICO was first notified of Heffler's potential class action liability on June 13, 2008, by means of a "potential claim" letter sent by Heffler's counsel.

3

(Def. Statement of Undisputed Material Facts, at ¶16; Pl. Statement of Undisputed Material Facts, at ¶47.) CAMICO initially funded Heffler's defense in the Oetting action, but on July 6, 2011, CAMICO advised Heffler that it was reserving all rights to recover costs and expenses relating to the defense of the Oetting action, which exceeded a $100,000 sub-limit provided in the policy. (Def. Statement of Undisputed Material Facts, at ¶28; Pl. Statement of Undisputed Material Facts, at ¶66.) CAMICO then filed the instant suit against Heffler, seeking, inter alia, declaratory judgment that CAMICO owes Heffler no defense or obligation beyond a single $100,0000 sub-limit, and that CAMICO is entitled to recover expenses incurred after July 6, 2011. Heffler filed two counterclaims, for (1) declaratory judgment that CAMICO has a duty to defend and indemnify not limited by the $100,000 sub-limit, and (2) bad faith.

The parties have agreed to resolve this case by way of cross-motions for summary judgment, subject to the proviso that the Court notify the parties of any genuine dispute of material fact. The Court has found no genuine dispute of material fact.

### III. LEGAL STANDARD

In considering motions for summary judgment, "the court is required to examine the evidence of record in the light most favorable to the party opposing summary judgment, and resolve all reasonable inferences in that party's favor." Wishkin v. Potter, 476 F.3d 180, 184 (3d Cir. 2007). The party opposing the motion, however, cannot "rely merely upon bare assertions, conclusory allegations or suspicions" to support its claim. Fireman's Ins. Co. v. DuFresne, 676 F.2d 965, 969 (3d Cir. 1982). After examining the evidence of record, a court should grant a motion for summary judgment if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); accord Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

4

A factual dispute is material when it "might affect the outcome of the suit under the governing law," and genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citation omitted).

## IV. DISCUSSION

"The task of interpreting an insurance contract is generally performed by a court rather than by a jury. The goal of that task is, of course, to ascertain the intent of the parties as manifested by the language of the written instrument. Where a provision of a policy is ambiguous, the policy provision is to be construed in favor of the insured and against the insurer, the drafter of the agreement. Where, however, the language of the contract is clear and unambiguous, a court is required to give effect to that language." Gene & Harvey Builders v. Pennsylvania Mfrs. Ass'n Ins. Co., 517 A.2d 910, 913 (Pa. 1986) (internal citations omitted).

"Contractual language is ambiguous if it is reasonably susceptible of different constructions and capable of being understood in more than one sense. This is not a question to be resolved in a vacuum. Rather, contractual terms are ambiguous if they are subject to more than one reasonable interpretation when applied to a particular set of facts." Madison Const. Co. v. Harleysville Mut. Ins. Co., 735 A.2d 100, 106 (Pa. 1999) (internal citations omitted). Courts should not, "however, distort the meaning of the language or resort to a strained contrivance in order to find an ambiguity." Id.

"Where an insurer relies on a policy exclusion as the basis for its denial of coverage and refusal to defend, the insurer has asserted an affirmative defense and, accordingly, bears the

5

burden of proving such defense." Canal Ins. Co. v. Underwriters at Lloyd's London, 435 F.3d 431, 435 (3d Cir. 2006).

1. Sub-Limit for Misappropriation, Misuse, Theft, or Embezzlement

CAMICO argues that it has no further obligation to defend or indemnify Heffler because coverage related to the Oetting action is limited by a sub-limit in the policy. That sub-limit states: "The maximum amount payable . . . for each covered Claim arising from, related to or in connection with any Insured's misappropriation, misuse, theft or embezzlement of funds shall be $100,000 in excess of the Per Claim Deductible." (Pl. Ex. A, at Sec. I(C)(1)(b).) CAMICO notes that it has paid over $200,000 in connection with the defense of the Oetting action, and that because the defense falls within the above sub-limit, CAMICO's has no further coverage obligation.

This argument raises several interpretive questions. First, did Penta engage in misappropriation, misuse, theft or embezzlement? Second, does Penta qualify as an insured given that he ceased working for Heffler in 2004 and the policy incepted in 2008? Third, and finally, was Penta performing professional services such that the exclusion applies? These questions are addressed in turn.

A. Did Penta Engage in Misappropriation, Misuse, Theft, or Embezzlement?

CAMICO claims that Penta, by submitting false and fraudulent claims in the NationsBank class action settlement, engaged in the misappropriation, misuse, theft or embezzlement of funds, triggering the $100,000 coverage sub-limit. Heffler counters that Penta did not himself steal or embezzle any client funds as required by the sub-limit, and therefore the sub-limit does not apply.

6

"Words of common usage in an insurance policy are construed according to their natural, plain, and ordinary sense." Kvaerner Metals Div. of Kvaerner U.S., Inc. v. Commercial Union Ins. Co., 908 A.2d 888, 897 (Pa. 2006). However, "[w]here a policy uses technical terms, those words are construed in their technical sense unless a contrary intention clearly appears." Westport Ins. Corp. v. Hanft & Knight, P.C., 523 F. Supp. 2d 444, 459 (M.D. Pa. 2007). The Court addresses each of the essential terms in the sub-limit provision of the policy.

First, the Court concludes that "misuse" is a term of common usage and rarely defined in the law outside of the field of product liability and copyright. See e.g. Sanders v. Lull Int'l, Inc., 411 F.3d 1266, 1270 (11th Cir. 2005) (defining product misuse under Georgia law). In its ordinary sense, misuse means to use incorrectly or to use for a "wrong or improper purpose." Schwartz v. Am. Honda Motor Co., Inc., 710 F.2d 378, 384 (7th Cir. 1983) (Swygert, J. dissenting) (quoting Lancaster v. Jeffrey Galion, Inc., 77 Ill. App. 3d 819, 823 (Ill. App. Ct. 2d Dist. 1979)). Thus, as the term is naturally understood, by submitting false claim forms and ensuring that such claims were approved by other Heffler employees, Penta misused funds that were to be administered to the NationsBank settlement class.

Next, the Court notes that the terms "misappropriation," "theft," and "embezzlement," are technical terms as commonly applied by the law to property and money. Westport Insurance Corp. concerned whether an exclusion for "misappropriation" applied where an attorney had fraudulently obtained loans from his clients to fund his gambling. 523 F. Supp. 2d at 459. The court found that, "the conduct alleged in the underlying complaint falls within the meaning of 'misappropriation.' Black's Law Dictionary (8th ed. 2004) defines misappropriation as '[t]he application of another's property or money dishonestly to one's own use.'" Id. Further, the court noted that, "[i]n the context of . . . unfair use of another's information or ideas . . . the elements

7

of misappropriation are (1) the plaintiff has made a substantial investment of time, effort and money into creating the thing misappropriated such that the court can characterize that 'thing' as a kind of property right . . . (2) the defendant has appropriated the 'thing' at little or no cost . . . and (3) the defendant has injured plaintiff by the misappropriation." Id. In this case, the underlying Amended Complaint alleges that the NationsBank settlement class had a right to the funds approved in the settlement agreement and that they were injured by Penta's actions. Further, the underlying Amended Complaint states that Penta ensured approval of the "false claims submitted by Penta and his co-conspirators," such that they must have appropriated the funds intended for the settlement class. (See Am. Compl. at ¶10.) Accordingly, the Court concludes that Penta engaged in misappropriation of client funds.

In the federal law context, embezzlement has been defined as "the fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come." In re Dulgerian, 388 B.R. 142, 150 (Bankr. E.D. Pa. 2008). As Penta, responsible for the administration of the settlement, at the very least assisted his co-conspirators in fraudulently appropriating such funds, the Court concludes that his conduct falls within the definition of embezzlement.

Finally, in determining the technical meaning of "theft," the Court notes that numerous types of theft are prohibited by state law. See e.g., 18 Pa. C.S.A. § 3927 (theft by failure to make required disposition of funds received); 18 Pa. C.S.A. § 3921 (theft by unlawful taking or disposition); 18 Pa. C.S.A. § 9322 (theft by deception). To take just one example, "A person is guilty of theft if he intentionally obtains or withholds property of another by deception. A person deceives if he intentionally: (1) creates or reinforces a false impression . . . ." 18 Pa. Cons. Stat. Ann. § 3922. Thus, state courts have held that where a defendant "provided false,

8

incomplete and misleading information in support of [an insurance claim] . . . to obtain money[,] [t]his constituted fraud and theft by deception." Com. v. Pozza, 750 A.2d 889, 893 (Pa. Super. Ct. 2000). Under this statute, "the accused need not have directly received the property but may consummate the crime by accomplishing delivery to a third party." Com. v. Posavek, 420 A.2d 532, 535 (1980). In this case, the underlying Amended Complaint alleges that Penta provided false information in support of settlement claims to obtain money. Even if Penta did not receive the funds directly, but rather funneled them to his co-conspirators, his acts still constitute theft of funds.

Indeed, for all of the above terms which relate to legal offenses, it is of no moment whether Penta was the ringleader of the scheme, or whether he received any or all of the stolen money directly. "It is well-established . . . that a defendant, who was not a principal actor in committing the crime, may nevertheless be liable for the crime if he was an accomplice of a principal actor." Com. v. Murphy, 844 A.2d 1228, 1234 (2004). The underlying Amended Complaint alleges that Penta intentionally arranged for the delivery of false claims from his co-conspirators, so that the he could "personally approve[] the fraudulent claims or [take] whatever steps necessary to make sure that other employees at Heffler approved the claims . . . ." (Am. Compl. at ¶54.) The underlying Amended Complaint thus alleges that, at the very least, Penta aided and abetted the commission of the above-described offenses.

The policy exclusion for misappropriation, misuse, theft, or embezzlement of funds applies in this case if Penta's conduct satisfied the definition of any one of those terms. The Court concludes that Penta's conduct falls within the definition of each of the terms.

B. <u>Was Penta Insured Under the Policy After He Ceased Working for Heffler?</u>

Under this "claims made" policy, CAMICO was obligated to insure certain claims against Heffler, if made within the policy period of January 23, 2008 to January 23, 2009. Section II of the policy states that certain enumerated persons, including former employees, are insured, "but only while performing Professional Services on or after the Retroactive Date." The Declarations section of the policy states that the Retroactive Date is January 1, 1943. Thus, CAMICO was obligated to insure certain claims made during the policy period, if they pertained to professional services of an insured after January 1, 1943.

Heffler argues that because Penta worked for the company from 2001-2004, he was not performing professional services for Heffler during the 2008-2009 policy period, and therefore Penta is not an "insured" under the policy. Accordingly, Heffler contends that the determination of the status of Penta is the time the claim was made. The Court disagrees.

Heffler's reading of the definition of "insured" is rejected. Heffler concedes that the policy includes former employees as insureds. (Pl. Ex. A, at Sec. II(b).) Heffler thus appears to argue that a former employee such as Penta is only "insured" if he performs "professional services" during the policy period. Heffler cites to no policy language, and the Court has found none, which limits the coverage of former employees to those who worked at some point during the policy period.

Further, the plain language of the policy establishes that former employees are insured "but only while performing Professional Services on or after the Retroactive Date." (Pl. Ex. A, at Sec. II.) Heffler attempts to distinguish the policy's insurance of prior acts dating back to 1943, from the fact that it only insures certain persons qualifying under the policy. This is a distinction without a difference. The quoted provision states that certain enumerated persons are

10

"insured" when performing "professional services" on or after January 1, 1943. Penta's actions, if they qualify as "professional services," fall within the relevant time period to qualify him as an "insured."[2] The Court thus concludes that, so long as Penta was performing professional services for Heffler during his employment, he is an "insured" under the policy.

C. Were Penta's Actions Professional Services?

Heffler argues that Penta is not "insured" because his conduct at issue does not constitute Professional Services on behalf of Heffler. Professional Services are defined in part as "any Professional Services performed by an Insured as long as the fees or commissions, if any, or other benefits from such service inure to the benefit of" Heffler. (Pl. Ex. A, at Sec. IV(o).) Heffler argues that because Penta's criminal acts did not result in any fees or other benefits to Heffler, Penta was not performing Professional Services, while committing his crimes and therefore Penta was not insured under the policy.

CAMICO counters that Heffler's reading renders the sub-limit provision surplusage. That is, Heffler appears to claim: "1. The sub-limit applies only to claims arising from misappropriation by an Insured; 2. An employee or former employee is not an Insured when he is misappropriating funds; 3. The sub-limit never applies." (Pl. Mot. at 16.) CAMICO argues that the phrase "while performing Professional Services" means that employees are considered "insured" when their services for Heffler provide benefits to the company through their work,

---

[2] Heffler relies on Township of Center, Butler Cnty., Pa. v. First Mercury Syndicate, Inc., 117 F.3d 115 (3d Cir. 1997), in support of its argument that Penta's status as insured is determined by reference to when the claim was made. That case is inapposite for two reasons. First, Township of Center concerned: (1) the insured status of the injured party, and (2) an exclusion for suits between two insureds. Neither of those facts is present in this case. Second, Township of Center does not govern the interpretation of all "claims made" contracts. In Foodtown Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa., 412 F. App'x 502, 508 (3d Cir. 2011), the Third Circuit held that the determination of "insured" status was not limited by Township of Center which "involved different policy language."

11

and such employees are not removed from the "insured" definition during the precise moments when they are committing misappropriation, misuse, theft, or embezzlement of funds.

Heffler agrees that under its interpretation of the sub-limit provision, the provision would never apply. Heffler states, "CAMICO's quarrel . . . is not with Heffler, it is with its own policy language. Pennsylvania law requires this Court to abide the plain meaning of that language." (Resp. at 18.) Heffler is incorrect.

"[N]o provision of a contract should be treated as surplusage or redundant if any reasonable meaning consistent with other parts of the agreement can be given to it . . . . " Wyoming Valley W. Sch. Dist. v. Nw. Sch. Dist., 695 A.2d 949, 953 (Pa. Commw. Ct. 1997); see also Pac. Employers Ins. Co. v. Global Reinsurance Corp. of Am., 693 F.3d 417, 430 (3d Cir. 2012) ("[A] cardinal rule of contractual interpretation . . . counsels against rendering words or provisions meaningless."). The Court will not treat the sub-limit as surplusage. Instead, a reasonable meaning can be given to the sub-limit which is consistent with the other parts of the policy. That is, the sub-limit provision applies to employees who engage in misappropriation, misuse, theft, or embezzlement of funds in connection with their employment for Heffler, and who are providing benefits to Heffler through their general employment. In this case, Penta engaged in misappropriation, misuse, theft or embezzlement in connection with his work for Heffler, and provided fees and other benefits to Heffler while he was working on the NationsBank class action settlement.[3] Accordingly, Penta was performing professional services for the benefit of Heffler when he committed the acts at issue.

---

[3] Heffler notes that Oetting's claim of respondeat superior was previously dismissed, as Penta was not acting within the scope of his authority during the scheme. Heffler contends that such dismissal supports a finding that Penta was not engaged in professional services. The Court disagrees. "That a person acted outside his authority does not mean he was not in the act of rendering professional services." Prof'l Asset Strategies, LLC v. Cont'l Cas. Co., 447 F. App'x 97, 99 (11th Cir. 2011).

In sum, the Court concludes that Penta's acts fall within the ambit of the $100,000 coverage sub-limit, that Penta qualifies as an insured for the period in question, and that a reasonable meaning for the sub-limit prevents it from being treated as surplusage. Accordingly the Court rules that the sub-limit applies to coverage of the Oetting action.[4]

2. Coverage for Innocent Insured

Heffler separately argues that Penta's criminal conduct cannot bar insurance coverage for negligence claims against Heffler. That is, Heffler notes that the Amended Complaint in the underlying Oetting action sounds in negligence and does not directly implicate Penta's criminal acts. On this issue Heffler argues that Pennsylvania case law prevents insurance companies from denying coverage for negligence claims asserted by an innocent insured, which are related to a criminal act committed by another insured.

In support of this argument, Heffler cites Bd. of Pub. Educ. of Sch. Dist. of Pittsburgh v. Nat'l Union Fire Ins. Co. of Pittsburgh, 709 A.2d 910 (Pa. Super. Ct. 1998) (en banc). In that case, a civil rights complaint was filed on behalf of a minor student, alleging that entities and persons associated with her public school district negligently failed to prevent molestation of the student by a school volunteer. Id. at 911. The school district's insurer disclaimed coverage on the ground that the policy did not apply to (1) any claims "involving" criminal acts, (2) any claims "arising out of . . . assault or battery," and (3) any claims "arising out of . . . bodily injury." Id. at 912. The Pennsylvania Superior Court rejected the insurer's argument and held that such exclusions did not apply to the asserted negligence claims because they could not be said to "involve" criminal acts or "arise out of" assault or bodily injury. Id. Heffler thus argues

---

[4] CAMICO also argues that an additional exclusion, the Prior Knowledge exclusion, bars further coverage for the defense of the Oetting action. Because the Court concludes that the exclusion for misappropriation, misuse, theft, or embezzlement applies, it need not decide whether the prior knowledge exclusion also bars further coverage.

13

that "as a matter of Pennsylvania law . . . the fraudulent or criminal conduct by one tortfeasor cannot vitiate coverage otherwise available for claims of negligence asserted against another." (Heffler Repl. at 12.)

Such a characterization sweeps too broadly. Initially, the Court notes that the CAMICO policy contains a provision which explicitly allows coverage for Innocent Insureds in certain circumstances. (Pl. Ex. A, at Sec. VI(B).) However, that provision does not apply to the exclusion for misappropriation, misuse, theft, or embezzlement.

State courts have held that, depending on the language of an insurance policy, coverage may be denied to "innocent insureds" who did not take part in a wrongful act or crime. In McAllister v. Millville Mut. Ins. Co., 640 A.2d 1283, 1288 (Pa. Super. 1994), the court held that "if the language of the policy, particularly the exclusionary clause, clearly indicates that the insureds' obligations are joint, then the prohibited acts of one insured bar all others from recovering." In that case involving three insured brothers, one committed arson by burning down the subject property. The other two sought coverage for the loss, but the court held that, "The use of the terms 'any' and 'an' in the exclusions clearly indicate that the insureds' obligations under the policy's neglect and intentional provisions are joint, not several . . . [such that] the intentional actions of [the arsonist brother] bar any recovery by the appellees." Id. at 1289.

"[P]olicy language referring to 'any insured' or similar language is unambiguous and indicates that the insureds' obligations and interests are joint." Ferrino v. Pac. Indem. Co., 1996 WL 32146, at *3 (E.D. Pa. Jan. 24, 1996). Another court in this district has held that where a policy exclusion barred claims for bodily harm intended by any insured, "there can be no coverage for any insured arising out of damage caused by the intentional or criminal acts of

14

another insured. Accordingly, [the insurer] has no duty to defend or indemnify . . . against the . . . claim of negligent supervision." Allstate Ins. Co. v. Kenney, 2003 WL 22316776, at *4 (E.D. Pa. Oct. 8, 2003); see also Westport Ins. Corp. v. Hanft & Knight, P.C., 523 F. Supp. 2d 444, 461 (M.D. Pa. 2007) (applying McAllister to a claims-made insurance policy held by a law firm).

The exclusion at issue in this case provides that there is a $100,000 cap for any claim, "arising from, related to or in connection with *any* Insured's misappropriation, misuse, theft or embezzlement of funds . . . ." (Pl. Ex. A, at Sec. I(C)(1)(b)) (emphasis added.) The Court thus concludes that the obligations of the insureds under the CAMICO policy are joint, and the cases which provide for the coverage of negligence claims in the context of underlying criminal conduct are inapposite.

This conclusion is buttressed by the broad language of the exclusion. That is, the cases cited by Heffler involve exclusions barring coverage for claims "arising out of" criminal conduct. See Nat'l Union Fire Ins. Co. of Pittsburgh, 709 A.2d 910. However, the CAMICO policy bars coverage for claims "arising from, related to or in connection with," any insured's misappropriation, misuse, theft, or embezzlement. (Pl. Ex. A, at Sec. I(C)(1)(b).) Noting that a "cardinal rule of contractual interpretation . . . counsels against rendering words or provisions meaningless," the Court finds the terms "related to" and "in connection with" to be broader in meaning than "arising out of" alone. See Pac. Employers Ins. Co. v. Global Reinsurance Corp. of Am., 693 F.3d 417, 430 (3d Cir. 2012).

In fact, "[t]he term 'related to' is typically defined more broadly and is not necessarily tied to the concept of a causal connection . . . Courts have similarly described the term 'relating to' as equivalent to the phrases 'in connection with' and 'associated with,' and synonymous with the phrases 'with respect to,' and 'with reference to,' and have held such phrases to be broader in

15

scope than the term 'arising out of.'" ACE Capital Ltd. v. Morgan Waldon Ins. Mgmt., LLC, 832 F. Supp. 2d 554, 570-71 (W.D. Pa. 2011) (quoting Coregis Ins. Co. v. Am. Health Found., Inc., 241 F.3d 123, 128-29 (2d Cir. 2001) (Sotomayor, J.)) The claims against Heffler are certainly related to, or are in connection with Penta's criminal acts, such that coverage for negligence claims is not required.

3. CAMICO's Claims for Relief

In its Amended Complaint, CAMICO asserts four claims for relief. First, CAMICO seeks a declaratory judgment that it owes no further obligation to defend or indemnify Heffler in the Oetting action beyond the $100,000 sub-limit. In the declaratory judgment claim CAMICO also seeks recovery of those sums expended in excess of the $100,000 sub-limit by CAMICO in the Oetting action after it informed Heffler of its reservation of right to seek recovery on July 6, 2011. The Court grants CAMICO's Motion for Summary Judgment as to the declaratory judgment claim.

CAMICO's second claim is for unjust enrichment. However, "[T]he doctrine of unjust enrichment is inapplicable when the relationship between parties is founded upon a written agreement or express contract . . . ." Wilson Area Sch. Dist. v. Skepton, 586 Pa. 513, 520 (Pa. 2006). As neither party disputes the existence of a valid contract in this case, the Court denies CAMICO's Motion as to the unjust enrichment claim, and dismisses that claim.

CAMICO's third and fourth claims assert, respectively, claims for money had and received, and recovery of overpayment. Both claims seek recovery of those sums expended in excess of the $100,000 sub-limit by CAMICO in the Oetting action on or after July 6, 2011. For the reasons set forth above, the Court grants CAMICO's Motion for Summary Judgment as to the claims for money had and received and recovery of overpayment.

4. Counterclaims

Heffler filed two counterclaims for: (1) declaratory judgment, and (2) bad faith. The declaratory judgment counterclaim argues that CAMICO has a duty to defend and indemnify Heffler, not limited by the $100,000 sub-limit. Given the rulings above, the Court grants CAMICO's motion for summary judgment as to Heffler's declaratory judgment counterclaim.

Next, to recover under a claim of bad faith under 42 Pa. C.S.A. § 8371, an insured must show that the insurer did not have a reasonable basis for denying benefits under the policy and that the insurer knew of or recklessly disregarded its lack of reasonable basis in denying the claim. Terletsky v. Prudential Property & Casualty Co., 437 Pa. Super. 108, 125 (Pa. Super. Ct. 1994). Heffler claims that CAMICO demonstrated bad faith in several ways. First, Heffler argues that CAMICO did not have a reasonable basis to rely upon the $100,000 sub-limit because it knew that Penta was not an "insured" and did not misappropriate or misuse money. Given the above rulings regarding the $100,000 sub-limit, the Court concludes that reliance on the $100,000 sub-limit was appropriate and cannot constitute bad faith.

Second, Heffler claims that CAMICO showed bad faith by relying belatedly on the Prior Knowledge exclusion, after repeatedly stating that it would defend up to the $100,000 sub-limit. Heffler invokes the common-law doctrine of "mend the hold" to justify its position. Under that doctrine, "[a] party who hokes up a phony defense to the performance of his contractual duties and then when that defense fails (at some expense to the other party) tries on another defense for size can properly be said to be acting in bad faith." Harbor Ins. Co. v. Cont'l Bank Corp., 922 F.2d 357, 363 (7th Cir. 1990). However, "Pennsylvania courts have rarely applied [the doctrine]." Rock-Epstein v. Allstate Ins. Co., 2008 WL 4425059, at *4 (E.D. Pa. Sept. 29, 2008).

17

The Court rejects Heffler's argument based on the Prior Knowledge exclusion. As Heffler notes, CAMICO's primary reason for denying coverage was the $100,000 sub-limit for misappropriation, misuse, theft, or embezzlement. The Court has concluded that the denial of coverage on this ground was proper. As the Prior Knowledge exclusion was not relied upon by the Court in deciding the case, it is of no legal significance.

Finally, Heffler claims that "delays" by CAMICO in responding to potential claim notices and stating its position regarding recoupment of defense costs are indicative of bad faith. The Court concludes that such any such delays do not constitute bad faith on the part of CAMICO. CAMICO's summary judgment motion is therefore granted as to Heffler's second counterclaim.

## V. CONCLUSION

For the foregoing reasons, CAMICO's Motion for Summary Judgment is granted as CAMICO's claims for declaratory judgment, money had and received, and recovery of overpayment. CAMICO's Motion is denied as to the unjust enrichment claim. CAMICO's Motion for Summary Judgment is granted as to Heffler's counterclaims. An appropriate order follows.